## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

ZURICH SPECIALTIES LONDON LIMITED, )
)
    Plaintiff/Counter-Defendant, )
)    **No. 07 CV 2171**
    v. )
)    **Hon. Joan H. Lefkow**
VILLAGE OF BELLWOOD, ILLINOIS, a )
municipal corporation, GREGORY MOORE, )
DONALD LEMM, NICHOLAS NARDUCCI, )
ST. PAUL MERCURY INSURANCE )
COMPANY, and ST. PAUL FIRE & MARINE )
INSURANCE COMPANY, )
)
    Defendants/Counter-Plaintiffs/ )
    Cross-Plaintiffs/Cross-Defendants. )

## OPINION AND ORDER

This case involves whether Zurich Specialties London Limited ("Zurich"), St. Paul

Mercury Insurance Company ("St. Paul Mercury"), and St. Paul Fire & Marine Insurance

Company ("St. Paul Fire") have the duty to defend and indemnify the Village of Bellwood ("the

Village"), Gregory Moore, and Donald Lemm (collectively, "the insureds") in the underlying

case of *Narducci* v. *Village of Bellwood*, No. 01 C 1425, which is currently pending in this

district. Zurich seeks a declaratory judgment that St. Paul Mercury and St. Paul Fire have the

duty to defend and indemnify the insureds and that it does not. The insureds filed a counter-

claim against Zurich and an amended cross-claim against St. Paul Mercury and St. Paul Fire

seeking declarations that the three insurance companies have the duty to defend and indemnify

them. St. Paul Mercury also filed an intervening complaint against the insureds seeking a

declaration that it does not have the duty to defend and indemnify them. Zurich and the insureds

now seek judgment on the pleadings regarding St. Paul Mercury's and St. Paul Fire's duties to

defend. Specifically, Zurich seeks judgment on Counts III, IV, IX, and X of its amended complaint, and the insureds seek judgment on Counts I and II of their amended cross-claim and all of St. Paul Mercury's intervening complaint.[1] St. Paul Mercury and St. Paul Fire have also filed a joint motion to dismiss the action as moot pursuant to Federal Rule of Civil Procedure 41(a)(2) and a cross-motion for judgment on the pleadings with respect to known loss. For the following reasons, Zurich's motion [#174] is granted in part and denied in part, the insureds' motion [#170] is granted, and St. Paul Mercury and St. Paul Fire's motion [#180] and cross-motion [#197] are denied.

## BACKGROUND

**I.      The St. Paul Mercury Policy**

St. Paul Mercury issued a comprehensive insurance policy to the Village covering June 1, 1999 to June 1, 2000 ("the 99-00 policies"). Zurich's Am. Compl. ¶ 13 & Ex. C (hereinafter, "Am. Compl. ¶ __"). The 99-00 policies included Commercial General Liability coverage ("the CGL policy"), Law Enforcement Liability coverage ("the LEL policy"), Public Entity Management Liability coverage ("the PEML policy"), and Umbrella Liability coverage ("the umbrella policy"). *Id.* ¶ 13. Lemm, then the Village mayor, and Moore, then the Village police chief, are covered by the 99-00 policies. *Id.* Relevant provisions of the 99-00 policies are described below.

**A.      The CGL Policy**

---

[1] The parties agree that claims regarding the duty to indemnify are not ripe for adjudication at this time. Additionally, Zurich and the insureds have agreed that issues of coverage between them not be decided by the court at this time.

Among other things, the CGL policy covers bodily injury, personal injury, and advertising injury.  Ex. C-2 to Am. Compl. at 20.  Personal injury includes injury resulting from the "[m]aking known to any person or organization written or spoken material that violates a person's right of privacy."  *Id.* at 21.  The CGL policy does not cover personal injury "that results from: [1] the protected person knowingly breaking any criminal law; or [2] any person or organization breaking any criminal law with the consent or knowledge of the protected person."  *Id.* at 33.  It also excludes coverage for personal injury resulting from material that was made known before the agreement became effective.  *Id.* at 35.  Finally, as relevant here, the CGL policy includes a law enforcement duties exclusion, which excludes from coverage injury resulting from the conduct of "any of the duties or obligations that must be performed or fulfilled by a law enforcement agency in order to enforce or carry out local, state or federal government laws or regulations."  *Id.* at 54.

The CGL policy is a claims-made policy and so applies to claims or suits made or brought while the policy is in effect or during the applicable limited reporting period.  *Id.* at 23.  A claim is "a demand which seeks damages," while a suit is "a civil proceeding which seeks damages."  *Id.* at 22.  Claims or suits are considered first made or brought on the earliest of "[t]he date that [St. Paul Mercury] or any protected person [such as Moore or Lemm] first receives written notice of such claim or suit" or "[t]he date that [St. Paul Mercury] first receive[s] notice of an event, personal injury offense, or advertising injury offense from any protected person."[2]  *Id.* at 23.  Although the CGL policy does not specify the form of notice,

_____

[2] Event is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  Ex. C-2 to Am. Compl. at 20.

certain rules on reporting potentially covered losses are applicable to the 99-00 policies.

Specifically, an insured is required to

> Tell [St. Paul Mercury] or [its] agent what happened as soon as possible. Do this even though no demand for damages has been made against you or any other protected person, but you or another protected person is aware of having done something that may later result in a demand for damages. This notice should include all of the following: [1] The time and place of the incident; [2] The protected person involved; [3] The specific nature of the accident or incident including the type of demand for damages that may result; and [4] The names and addresses of any witnesses and injured people.

Ex. C-1 to Am. Compl. at 32. The insured also must send St. Paul Mercury copies of all written demands and all legal documents if a lawsuit is initiated. *Id.*

## B. The LEL Policy

The LEL policy covers amounts any protected person is legally required to pay for covered injury or damage that results from the conduct of law enforcement duties by or for the Village Police Department and that is caused by a wrongful act ("any act, error, or omission"). Ex. C-2 to Am. Compl. at 69–70. Law enforcement duties are "any of the duties or obligations that must be performed or fulfilled by or for [the Village's] law enforcement agency." *Id.* at 70. Covered personal injury includes the "[m]aking known to any person or organization written or spoken material that violates a person's right of privacy" and the "[v]iolation of civil rights protected under any federal, state, or local law." *Id.* The LEL policy does not cover "injury or damage that results from any criminal, dishonest, or fraudulent act or omission committed: [1] by the protected person; or [2] with the consent or knowledge of the protected person." *Id.* at 74.

Like the CGL policy, the LEL policy operates on a claims-made basis. A claim or suit is considered first made or brought upon the earlier of St. Paul Mercury's or the insured's receipt of written notice of the claim or suit or St. Paul Mercury's receipt of notice of a wrongful act

from the insured. *Id.* at 71. The LEL policy specifies that notice will not be accepted "unless it also describes what injury or damage may result from the wrongful act." *Id.*

C.    **The PEML Policy**

The PEML policy, like the LEL policy, is a supplement to the CGL policy. Under it, St. Paul Mercury is to cover damages a protected person must pay for covered losses caused by a wrongful act that results from the conduct of duties by or for the Village. *Id.* at 81. Wrongful acts are any acts, errors, or omissions, including employment-related practices. *Id.* The PEML policy does not cover loss resulting from injury or damage, which includes personal injury offenses, unless the offense is an employment-related practice. Ex. C-3 to Am. Compl. at 1–2. It also does not cover losses resulting from "intentionally wrongful, criminal, dishonest, or fraudulent act[s] or omission[s]," but this exclusion only applies if a court has determined that such conduct occurred. *Id.* at 2. Losses resulting from known wrongful acts and law enforcement duties are excluded. *Id.*

As with the other parts of the 99-00 policies, the PEML policy operates on a claims-made basis. Ex. C-2 to Am. Compl. at 83. Notice of a wrongful act that subsequently results in a claim is sufficient to trigger coverage as long as the notice "describes with particularity details of the wrongful act, including the date and identity of involved persons and what loss may result from the wrongful act." *Id.*

### D. The Umbrella Policy

The umbrella policy provides coverage for damages covered by the Village's basic insurance when the damages exceed the basic insurance limits.[3] Ex. C-4 to Am. Compl. at 41. It also covers damages covered by the umbrella policy but not the Village's basic insurance. *Id.* at 42. The umbrella policy covers personal injury offenses, defined as in the CGL policy, that are committed prior to the umbrella policy's expiration. *Id.* at 40. The umbrella policy provides that St. Paul Mercury does not have the duty to defend if the Village's basic or other insurance policy provides a duty to defend. The umbrella policy only requires St. Paul Mercury to assume the defense if the basic insurance has been exhausted and no other insurance covers the injury or damage. *Id.* at 42. As the CGL policy operates on a claims-made basis, so does the umbrella policy. *Id.* at 43–44. The umbrella policy does not cover personal injury resulting from the deliberate breaking of the law, *id.* at 50, from material that was made known prior to the policy's inception, *id.* at 52, or from law enforcement activities, *id.* at 66. The umbrella policy is excess insurance, applying only after all other insurance has been exhausted. *Id.* at 57.

## II. The St. Paul Fire Policy

From July 1, 2000 to July 1, 2001, the Village had only Commercial General Liability coverage ("the 00-01 policy") from St. Paul Mercury's affiliate, St. Paul Fire. Am. Compl. ¶ 14 & Ex. D. The 00-01 policy operated on a claims-made basis on the same terms as the CGL policy. *See generally* Ex. D to Am. Compl. It is primary insurance, meaning that if the Village

---

[3] For purposes of applying the umbrella policy, the term "basic insurance" includes the CGL policy. Ex. C-4 to Am. Compl. at 37.

had other primary insurance that covered the loss, St. Paul Fire would share with the other insurance the amount the Village had to pay as damages. Ex. D-3 to Am. Compl. at 1.

## III.  The Zurich Policy

As a supplement to the 00-01 policy, the Village obtained Public Officials and Employment Liability and Law Enforcement Liability policies from Zurich ("the Zurich policies"), effective from July 1, 2000 to July 1, 2001. Am. Compl. ¶¶ 15–16. Moore and Lemm are covered by the Zurich policies. *Id.* The Zurich policies also operate on a claims-made basis. *Id.* While the Law Enforcement Liability policy is primary insurance, Ex. F to Am. Compl. at 8, the Public Officials and Employment Liability policy is excess insurance if other insurance covers the wrongful act at issue, Ex. E to Am. Compl. at 9.

## IV.  Events Leading to the Underlying Litigation

In January 1994, the Village Police Department began taping phone lines assigned to the Village Finance Department. St. Paul Mercury's Intervening Compl. ¶ 25. Lemm, the Village mayor, and Moore, the Village police chief, were aware of the taping at that time. *Id.* ¶¶ 25, 37.

On February 28, 2000, Narducci, then the Village comptroller, attended a Village meeting during which he allegedly first learned that Finance Department phone lines were being taped. Am. Compl. ¶ 17. As he believed that this taping was illegal, Narducci drafted a memorandum to Moore on March 1, 2000, demanding that the taping stop and inquiring about who had access to the tapes. *Id.* ¶¶ 19–20. Narducci also met with Lemm and Moore about the taping at some point between March 1, 2000 and May 10, 2000. *Id.* ¶ 32–33. During this meeting, Narducci informed Lemm that he had discussed the taping with a friend, the Will County State's Attorney. *Id.* Moore acknowledged that he knew of the taping. *Id.*

On April 17, 2000, attorneys Michael Sturino and Gerald Haberkorn wrote to Lemm and the Village Board of Trustees stating that they had become aware of the taping of the Finance Department's phone lines by the Village Police Department. *Id.* ¶ 21. While they claimed not to know the truth or falsity of the matter, they advised the Village that any legal opinions, including those regarding exposure to criminal and civil liability, should be rendered by the Village attorney. *Id.* & Ex. H. Village attorney John Sullivan was copied on the letter. *Id.* Sullivan responded on April 20, 2000, requesting further details regarding the wiretapping, so as to aid in evaluating possible legal violations but also "to address the liability insurance carrier of the Village as to the possibility of any claims that may be made against the Village." *Id.* ¶ 22 & Ex. I. Haberkorn responded on April 24, 2000, refusing to provide Sullivan with additional information in accordance with Haberkorn's professional responsibilities. Insureds' Am. Cross-Claim ¶ 13 & Ex. 4 (hereinafter, "Am. Cross-Claim ¶ __").

On May 10, 2000, the wiretapping was discussed at a Village Board of Trustees meeting. *Id.* ¶ 35. Moore disclaimed knowing of the wiretapping. Ex. N to Am. Compl. On July 13, 2000, a Village trustee, Art Grapenthien, wrote to Lemm about the taping. Am. Compl. ¶ 37. He referenced Narducci's March 1, 2000 memorandum and reiterated a demand he had made during the May 10, 2000 meeting that he be told who authorized the taping, who had custody of the tapes, and who had listened to them. *Id.* ¶ 37 & Ex. O.

On January 9, 2001, Timothy Mahoney, an attorney for Narducci, wrote to Joyce Ann Porter, who had replaced Lemm as the Village mayor, regarding the wiretapping. *Id.* ¶ 38 & Ex. P. The letter outlined the Village's potential liability for violating Narducci's and others' privacy and civil rights. *Id.* While estimating that damages could exceed $210,000, Narducci

requested $175,000 and assurance that the wiretaps had been removed to settle his claims prior to filing a lawsuit. *Id.* The offer was good until February 15, 2001. *Id.*

## V.      The Underlying Case

On February 28, 2001, Narducci brought suit against the insureds in this district. *Id.* ¶ 11 & Ex. A. The complaint was based on the above-described wiretapping, which Narducci alleged violated his fourth and fourteenth amendment rights. *Id.* Narducci amended his complaint on March 30, 2001, adding class allegations and claims for violation of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 *et seq.*, the Illinois Eavesdropping Act, 720 Ill. Comp. Stat. 5/14-1 *et seq.*, and Illinois common law intrusion into the seclusion of another. *Id.* ¶ 12 & Ex. B. A class was certified and summary judgment was granted in the insureds' favor on the state law claims and any Title III claims involving calls made after Narducci learned of the wiretapping. *See Narducci* v. *Moore*, 444 F. Supp. 2d 924 (N.D. Ill. 2006), *aff'd*, 572 F.3d 313 (7th Cir. 2009). Other claims remain pending.

## VI.      Notice to St. Paul Mercury and St. Paul Fire

On April 26, 2000, Sullivan forwarded Sturino and Haberkorn's letter, Sullivan's request for further information, and Haberkorn's response to Near North Insurance Brokerage ("Near North"), the Village's insurance broker. *Id.* ¶ 23. The next day, he provided Near North with a copy of an article from the Chicago Daily Law Bulletin regarding the Seventh Circuit's decision in *Abbott* v. *Village of Winthrop Harbor*, 205 F.3d 976 (7th Cir. 2000), which involved the surreptitious recording of personal phone calls on a municipality's police department line by the

police chief. *Id.* ¶ 24. Near North sent St. Paul Mercury an Acord Notice enclosing these documents and noting that the Village police were being accused of eavesdropping.[4] *Id.* ¶ 25.

Upon receipt of the Acord notice, St. Paul Mercury opened a claim file under claim number 09t013. *Id.* ¶ 26. Alinda Canterbury, who was assigned to investigate the matter, wrote to Ron Massey, also a St. Paul employee, the following:

> You may want to follow this loss, at least for a while – the Bellwood Finance Dept. (which I'm assuming is part of the Village of Bellwood) is alleging wire tapping by the Bellwood Police Dept. It does not appear they have proof and it is unclear as to whether a claim is being made. I'm trying to reach the Village Attorney. . . . There would be some coverage issues I'm sure – I doubt this is police business, and if it did occur, it was probably done by one individual secretly, rather than the whole dept. I can let you know the details when I receive them.

Ex. 6 to Am. Cross-Claim. After further investigation, she concluded that the file should be closed, memorializing her decision in another email to Massey:

> It appears that, according to an attorney who prosecutes for the Village (is contracted by the Village) [he] was contacted by someone (he would not advise who) about possible eavesdropping/wire tapping being conducted within the Finance Dept. of the Village of Bellwood, supposedly involving the Chief of Police. This allegedly has been going on for 7-8 years. He is not aware of a claim being made. This individual basically wants the Village Attorney to conduct an internal investigation to determine whether or not this is indeed occurring or has occurred in the past. It was reported by the Village Attorney to avoid a late notice issue should something arise out of this. . . . I don't think we should get involved in an internal Village investigation when a claim is not actually being made by anyone.

Ex. 7 to Am. Cross-Claim. The file was closed on May 1, 2000. Am. Compl. ¶ 31. On May 5, 2000, Sullivan wrote to Lemm to report that St. Paul Mercury had concluded it could do nothing

---

[4] Acord Notices are standardized forms used to report claims and potential claims to insurers.

until an actual claim was presented. *Id.* ¶ 34. He added that if anything further developed, Canterbury was to be contacted immediately. *Id.*

The Village provided St. Paul Mercury and St. Paul Fire with no further information about a potential claim until after it received Narducci's demand letter in January 2001. The Village forwarded this letter to Near North on January 31, 2001. *Id.* ¶ 39. Near North sent St. Paul Fire an Acord Notice accompanied by the demand letter on February 6, 2001. *Id.* ¶ 40. St. Paul Fire assigned the file claim number 09t016. *Id.* ¶ 41. After investigation, St. Paul claim representative Eric Brown wrote to claim coverage consultant Vanessa Yacola on February 8, 2001 recommending that the Village be defended under a reservation of rights. *Id.* ¶ 43. Specifically, he stated that he "believe[d] there is [coverage under the 00-01 policy] under the definition of personal injury, however [he] also [saw] a need for a reservation of rights as to intentional acts, punitive damages, [and] deliberately breaking the law." Ex. Q to Am. Compl. He also noted that, from his conversations with Village representatives, it appeared that the first written notice of the claim was the demand letter and that the Acord Notice was St. Paul Fire's first notice of the claim. *Id.* Further, he related that the Village representatives told him that Narducci "may have made rumblings about a claim but never actually presented one until 1/9/01 letter." *Id.* While this meant that the loss would fall under the 00-01 policy and require the Village to turn the claim into Zurich as well, he directed Yacola to the 99-00 policies. *Id.* Yacola responded that the claim arose out of law enforcement activity, was thus not covered by the 00-01 policy, and should be referred to Zurich, the Village's Law Enforcement Liability and Public Entity Management Liability carrier for that year. Ex. R to Am. Compl. On February 12, 2001, Brown wrote to the Village, acknowledging having received notice of Narducci's claim

but informing it that the claim was not covered by the 00-01 policy. Ex. S to Am. Compl. The denial of coverage was based on the 00-01 policy's law enforcement duties exclusion. *Id.* Brown recommended that the Village turn the claim into Zurich. He also offered the Village the opportunity to submit additional information that might affect St. Paul Fire's coverage analysis. *Id.* Finally, the letter stated that St. Paul Fire did "not intend to waive any other defense under the policy." *Id.* St. Paul Fire closed the claim file the same day. Am. Compl. ¶ 48. The insureds subsequently tendered the *Narducci* claim to Zurich, which in April 2001 agreed to defend the insureds pursuant to a full reservation of rights. *Id.* ¶ 80–81.

On September 13, 2001, Near North sent four Acord Notices to St. Paul referencing former policies, including the 99-00 policies. *Id.* ¶ 55. The Acord Notices referred to the *Narducci* suit and were made for "NOTICE ONLY!" Ex. U to Am. Compl. They included a letter from defense counsel in *Narducci* to the Village, informing it that Narducci's attorney stated at a status hearing that the alleged wiretapping had been going on for eight to ten years, meaning the suit could cover that entire time period. *Id.* Counsel suggested that the Village contact prior insurance carriers to advise them of the lawsuit and that a claim may be made under their policies. *Id.* Counsel directed that the notice need only "cite a copy of the complaint and advise the insurance carriers that [the Village is] putting them on notice based upon the representations made by plaintiff's attorney." *Id.* The Acord Notices included the name of the underlying suit and the names of counsel for both plaintiff and defendants in that case. *Id.* On September 17, 2001, Brown sent a letter to the Village in response to the Acord Notices. Am. Compl. ¶ 56 & Ex. V. The letter identified prior policies between the Village and St. Paul, including the 99-00 policies. Ex. V to Am. Compl. St. Paul disclaimed coverage under the CGL

policy for the same reason outlined in its February 12, 2001 letter, that the claim was not covered because of the law enforcement duties exclusion. *Id.* While acknowledging that the 99-00 policies included the LEL policy, St. Paul disclaimed coverage under that policy because the claim was first made on January 9, 2001, outside the coverage period. *Id.*

On February 19, 2003, Stan Lewiecki, a representative of Zurich's third-party administrator, Professional Claim Managers, wrote Brown to inquire as to the reason St. Paul denied coverage for the *Narducci* claim and to request copies of the denial of coverage letters and St. Paul policies. Am. Cross-Claim ¶ 35. Lewiecki also enclosed a copy of the first amended complaint in *Narducci*. *Id.*

On November 30, 2004, Zurich's coverage counsel sent a letter to the Village requesting information on other insurance policies that may provide the insureds with coverage in *Narducci*. *Id.* ¶ 36. This letter was forwarded to Brown on December 3, 2004. *Id.* ¶ 37. Zurich's coverage counsel also forwarded a copy of the first amended complaint in *Narducci* to Brown on December 6, 2004. *Id.* ¶ 38. On December 28, 2004, Brown again wrote to the Village, inquiring as to whether the insureds were seeking coverage from St. Paul Fire. Ex. 21 to Am. Cross-Claim. Coverage under the 00-01 policy was again disclaimed, as St. Paul Fire maintained that Narducci was not seeking recovery for bodily injury, property damage, personal injury, or advertising injury. *Id.* Further, the letter reiterated that the law enforcement duties exclusion applied and, for the first time, St. Paul Fire stated that the insureds breached the notice provisions by not providing it with a copy of the complaint along with its February 6, 2001

notice of claim.[5]  *Id.*  Brown also attached his September 17, 2001 letter that detailed the denial of coverage under the LEL policy.  *Id.*

**VII.    Coverage Lawsuits**

Zurich initiated this suit on April 19, 2007, naming the insureds, Narducci, and St. Paul Fire as defendants.  On July 5, 2007, St. Paul Fire filed a declaratory judgment action in the Circuit Court of Cook County, Illinois.  Am. Compl. ¶ 70.  St. Paul Fire sought a declaration that it did not have the duty to defend or indemnify the insureds in *Narducci* under any policies it and St. Paul Mercury had with the Village, including the 99-00 policies and the 00-01 policy.  *Id.* The state court complaint alleged that the January 9, 2001 demand letter was the first notice St. Paul received of Narducci's claim and the alleged wiretapping.  *Id.*  St. Paul Fire then moved to dismiss or stay this suit based on its filing of the state action, which the court denied in November 2007.  The insureds then filed cross- and counter-claims.  After discovery was conducted, Zurich filed an amended complaint in January 2010, adding St. Paul Mercury as a defendant.  The insureds similarly added St. Paul Mercury to their amended cross-claim.  St. Paul Mercury filed an intervenor complaint seeking a declaratory judgment that it has no duty to defend or indemnify the insureds in February 2010.

Zurich and the insureds filed their motions for judgment on the pleadings with respect to St. Paul Mercury's and St. Paul Fire's duty to defend on May 4, 2010.  A day later, St. Paul Mercury and St. Paul Fire filed a motion to dismiss the action as moot, attaching an April 28, 2010 letter from St. Paul Mercury informing the Village that it will undertake the defense in *Narducci* under the 99-00 policies pursuant to a reservation of rights.  Ex. A to St. Paul's Mot. to

---

[5] The initial complaint in the *Narducci* suit was not filed until February 28, 2001.

Dismiss.  The letter further outlines its defenses, including whether Sturino and Haberkorn's April 17, 2000 letter to Lemm was sufficient to constitute notice of a claim.  *Id.*  St. Paul Mercury also represents that it has agreed to pay half of all defense costs incurred by Zurich to date and in the future.  St. Paul's Mot. to Dismiss ¶ 11.

## ANALYSIS

### I.     St. Paul Mercury and St. Paul Fire's Motion to Dismiss

As St. Paul Mercury accepted the insureds' defense in *Narducci* on April 28, 2010, St. Paul Fire and St. Paul Mercury claim that the insureds' claims regarding the duty to defend are moot.  Further, because St. Paul Mercury has agreed to pay half of all defense fees Zurich has incurred to date and on a going forward basis, St. Paul Fire and St. Paul Mercury argue that the only remaining claim Zurich has against them is that it is owed all of its defense fees to date.  St. Paul Fire and St. Paul Mercury argue that this issue, in addition to the indemnification claims, should be deferred until *Narducci* is resolved.[6]  While St. Paul Fire and St. Paul Mercury base their motion on Rule 41(a)(2),[7] it is more properly considered as a Rule 12(b)(1) motion for lack of subject matter jurisdiction.

---

[6] Zurich and the insureds agree that the indemnification claims should not be decided until *Narducci* is resolved.  *See Grinnell Mut. Reinsurance Co.* v. *Reinke*, 43 F.3d 1152, 1154 (7th Cir. 1995) ("Illinois treats arguments about the duty to indemnify as unripe until the insured has been held liable.").

[7] Pursuant to Rule 41(a)(2), the court in its discretion may dismiss an action at the plaintiff's request. Fed. R. Civ. P. 41(a)(2); *Kunz* v. *DeFelice*, 538 F.3d 667, 677 (7th Cir. 2008).  A district court will be found to abuse its discretion in dismissing the action where the defendant can show that he will suffer "plain legal prejudice."  *Id.*  Four factors are generally considered in determining whether such prejudice will arise: "[t]he defendant's effort and expense of preparation for trial, excessive delay and lack of diligence on the part of the plaintiff in prosecuting the action, insufficient explanation for the need to take a dismissal, and the fact that a motion for summary judgment has been filed by the defendant."  *Id.* at 677–78 (quoting *Pace* v. *S. Express Co.*, 409 F.2d 331, 334 (7th Cir. 1969)).  In this case, only St. Paul Mercury's complaint regarding its duty to defend would be properly dismissed as moot under Rule 41(a)(2) pursuant to its request.

Rule 12(b)(1) provides that a case will be dismissed if the court lacks the authority to hear and decide the dispute. The standard of review for a Rule 12(b)(1) motion to dismiss depends on the purpose of the motion. *See United Phosphorous, Ltd.* v. *Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir. 2003) (en banc). If subject matter jurisdiction is not evident from the face of the complaint, the court analyzes the motion to dismiss under Rule 12(b)(1) as any other motion to dismiss and assumes for purposes of the motion that the allegations in the complaint are true. *Id.* Where, as here, however, "the complaint is formally sufficient but the contention is that there is *in fact* no subject matter jurisdiction, the movant may use affidavits and other materials to support the motion." *Id.*

Under Article III of the United States Constitution, federal courts have jurisdiction over live cases and controversies. A case becomes moot, however, "when the dispute between the parties no longer rages, or when one of the parties loses his personal interest in the outcome of the suit." *Holstein* v. *City of Chicago*, 29 F.3d 1145, 1147 (7th Cir. 1994). "Once the defendant offers to satisfy the plaintiff's entire demand, there is no dispute over which to litigate and a plaintiff who refuses to acknowledge this loses outright, under Fed. R. Civ. P. 12(b)(1), because he has no remaining stake." *Rand* v. *Monsanto*, 926 F.2d 596, 598 (7th Cir. 1991) (citations omitted).

While St. Paul Mercury has now acknowledged its duty to defend the insureds in *Narducci*, this does not moot Zurich's or the insureds claims against it regarding the duty to defend, as their claims request not only a declaration that St. Paul Mercury had a duty to defend but also that St. Paul Mercury breached this duty to defend and so is estopped from asserting coverage defenses and owes Zurich the entirety of its costs in defending the insureds in

*Narducci*.  Further, St. Paul Mercury continues to contest its duty to defend in response to Zurich's and the insureds' motions.  Although a declaration of estoppel effectively prevents the insurer from contesting the indemnification issue, estoppel may be decided prior to the resolution of the underlying litigation as it flows from a determination that the insurer breached its duty to defend.  St. Paul Fire has not explained how St. Paul Mercury's decision to accept the defense moots Zurich's and the insureds' claims regarding its duty to defend under the 00-01 policy.  Because a justiciable controversy remains, St. Paul Mercury's and St. Paul Fire's motion to dismiss will be denied, and the court will proceed to consider the pending motions for judgment on the pleadings.

**II.     Zurich's and the Insureds' Motions for Judgment on the Pleadings**

A motion for judgment on the pleadings under Rule 12(c) is subject to the same standard of review as a motion to dismiss under Rule 12(b)(6).  *N. Ind. Gun & Outdoor Shows, Inc.* v. *City of S. Bend*, 163 F.3d 449, 452 (7th Cir. 1998).  In considering a Rule 12(c) motion, the court considers the complaint, the answer, and any written instruments attached as exhibits.  *Id.* at 452–53.  The court must accept all well-pleaded allegations in the complaint as true and must draw all reasonable inferences in the non-movant's favor.  *United States* v. *Wood*, 925 F.2d 1580, 1581 (7th Cir. 1991).  A grant of judgment on the pleadings is appropriate where "it is beyond doubt that the non-movant can plead no facts that would support his claim for relief."  *Id.*


Zurich and the insureds contend that St. Paul Mercury and St. Paul Fire are required to defend the insureds in *Narducci*.  Under Illinois law, "an insurer's duty to defend is determined by comparing the allegations in the underlying complaint to the relevant provisions of the

insurance policy." *LaGrange Mem'l Hosp.* v. *St. Paul Ins. Co.*, 740 N.E.2d 21, 26, 317 Ill. App. 3d 863, 251 Ill. Dec. 191 (2000). The duty to defend is broader than the duty to indemnify; an insurer may be required to defend even though it ultimately may not be required to indemnify the insured. *Zurich Ins. Co.* v. *Raymark Indus., Inc.*, 514 N.E.2d 150, 163, 118 Ill. 2d 23, 112 Ill. Dec. 684 (1987). The duty to defend arises if the complaint's allegations fall within or potentially within the policy's coverage. *LaGrange Mem'l Hosp.*, 740 N.E.2d at 26. "[T]he complaint need present only a possibility of recovery, not a probability of recovery." *Id.* at 27. An insurer may not refuse to defend its insured "unless it is *clear* from the face of the underlying complaint[ ] that the allegations fail to state facts which bring the case within, or potentially within, the policy's coverage." *U.S. Fid. & Guar. Co.* v. *Wilkin Insulation Co.*, 578 N.E.2d 926, 930, 144 Ill. 2d 64, 161 Ill. Dec. 280 (1991). Any doubts as to coverage are to be resolved in favor of the insured. *Id.*

Where an insurer determines that a complaint is not potentially covered by its insurance policy, it must either defend the suit under a reservation of rights or seek a declaratory judgment that there is no coverage. *Emp'r's Ins. of Wausau* v. *Ehlco Liquidating Trust*, 708 N.E.2d 1122, 1134–35, 186 Ill. 2d 127, 237 Ill. Dec. 82 (1999). If an insurer does not take one of these steps and is later found to have breached its duty to defend, it is estopped from raising policy defenses to coverage, even despite their potential viability. *Id.* at 1135. Estoppel does not apply "where the insurer was given no opportunity to defend; where there was no insurance policy in existence; and where, when the policy and the complaint are compared, there clearly was no coverage or potential for coverage." *Id.* at 1136.

Where an insurer determines that it does not owe the insured a duty to defend and seeks a declaratory judgment, the insurer must act "promptly" or "in a timely manner" to avoid estoppel. *L.A. Connection* v. *Penn-Am. Ins. Co.*, 843 N.E.2d 427, 432, 363 Ill. App. 3d 259, 300 Ill. Dec. 169 (2006). Illinois courts have used three different approaches in determining what qualifies as prompt or timely action. The first approach deems an action timely if filed before the conclusion of the underlying litigation. *See, e.g.*, *Pekin Ins. Co.* v. *Allstate Ins. Co.*, 768 N.E.2d 211, 214, 329 Ill. App. 3d 46, 263 Ill. Dec. 451 (2002); *Farmers Auto Ins. Ass'n* v. *Country Mut. Ins. Co.*, 722 N.E.2d 1228, 1234, 309 Ill. App. 3d 694, 243 Ill. Dec. 159 (2000). The second approach looks at whether the insured delayed filing or responding to a declaratory judgment action until trial or settlement was imminent. *See, e.g.*, *St. Paul Fire & Marine Ins. Co.* v. *Village of Franklin Park*, No. 04 C 8287, 2006 WL 862902, at *7 (N.D. Ill. Mar. 31, 2006), *aff'd on other grounds*, 523 F.3d 754 (7th Cir. 2008); *Aetna Cas. & Sur. Co.* v. *O'Rourke Bros., Inc.*, 776 N.E.2d 588, 596, 333 Ill. App. 3d 871, 267 Ill. Dec. 216 (2002); *Westchester Fire Ins. Co.* v. *G. Heileman Brewing Co.*, 747 N.E.2d 955, 965, 321 Ill. App. 3d 622, 254 Ill. Dec. 543 (2001). The third approach considers an insurer to have timely sought declaratory relief if filed within a reasonable time of learning of the underlying action. *See, e.g.*, *State Auto Mut. Ins. Co.* v. *Kingsport Dev., LLC*, 846 N.E.2d 974, 987, 364 Ill. App. 3d 946, 301 Ill. Dec. 371 (2006); *L.A. Connection*, 843 N.E.2d at 433; *W. Am. Ins. Co.* v. *J.R. Constr. Co.*, 777 N.E.2d 610, 620, 334 Ill. App. 3d 75, 267 Ill. Dec. 807 (2002); *Korte Constr. Co.* v. *Am. States Ins.*, 750 N.E.2d 764, 770, 322 Ill. App. 3d 451, 255 Ill. Dec. 847 (2001). Although the Illinois Supreme Court has not yet decided the issue, this court agrees with those courts that have adopted the third approach. "[T]he reasonable time test promotes quick action by insurers and best serves the goal

of the estoppel doctrine – enforcement of the duty to defend." *L.A. Connection*, 843 N.E.2d at 433; *see also Kingsport Dev., LLC*, 846 N.E.2d at 987 ("Tests that require only that an insurer file a declaratory judgment action before the underlying suit is resolved or a trial or settlement is imminent contravene this goal [of enforcing the duty to defend], as they potentially give an insurer free license to abandon its insured until the underlying case is almost complete or well underway."); *Elec. Ins. Co.* v. *Nat'l Union Fire Ins. Co. of Pittsburgh*, 346 F. Supp. 2d 958, 968 n.10 (N.D. Ill. 2004) ("Were the Illinois Supreme Court to address this issue, it would reject [the first two approaches] because they disregard the time period between the insured's demand and the insurer's actions. These definitions tie timeliness to the progress of the underlying litigation, rather than to the insurer's actions. Defining timeliness in relation to the insurer's actions promotes prompt action because the chance of estoppel increases the longer the insurer waits to act."). While a short delay does not warrant invoking estoppel, *see, e.g.*, *Kingsport Dev., LLC*, 846 N.E.2d at 988 (seven month delay in seeking declaratory judgment not unreasonable); *L.A. Connection*, 843 N.E.2d at 433 (four month delay not unreasonable), delays of over a year have been found unreasonable by courts employing the reasonable time test, *see, e.g.*, *Elec. Ins. Co.*, 346 F. Supp. 2d at 969 (nineteen month delay unreasonable); *Coltec Indus. Inc.* v. *Zurich Ins. Co.*, No. 99 C 1087, 99 C 3192, 2004 WL 413304, at *10 (N.D. Ill. Jan. 30, 2004) (seven years)*; Uhlich Children's Advantage Network* v. *Nat'l Union Fire Co.*, 929 N.E.2d 531, 543, 398 Ill. App. 3d 710, 340 Ill. Dec. 880 (2010) (two years); *J.R. Construction Co.*, 777 N.E.2d at 620 (21.5 months); *Korte*, 750 N.E.2d at 769–70 (twelve months). Because estoppel only applies where an insurer breaches the duty to defend, the court will first consider whether St. Paul Mercury and St. Paul Fire had a duty to defend the insureds under the 99-00 and 00-01 policies.

## A.    Duty to Defend

In their joint memorandum, Zurich and the insureds set out in great detail why St. Paul Mercury and St. Paul Fire had the duty to defend the insureds in *Narducci*.  In response, St. Paul Mercury and St. Paul Fire only take issue with certain contentions, thus narrowing the issues to be decided by the court.  St. Paul Mercury's recent decision to accept the insureds' defense in *Narducci* effectively concedes that the allegations of the complaint potentially fall within the 99-00 policies' provisions.  While St. Paul Mercury has reserved its right to contest coverage, it has "acknowledged an obligation to fund the entirety of the Village's defense pursuant to a reservation of rights under its 1999-2000 Policy."  St. Paul Mercury & St. Paul Fire's Reply to Mot. to Dismiss at 8.  Nonetheless, St. Paul Mercury and St. Paul Fire contend that judgment should be granted in their favor based on the fact that it is apparent from the face of the complaint in *Narducci* that the wiretapping was a known loss not covered by the 99-00 and 00-01 policies, meaning that they had no duty to defend in the first place and so estoppel cannot apply.  They further argue that judgment on the pleadings is not warranted as further discovery is needed to determine whether coverage is barred by the Village's alleged withholding of material information in connection with St. Paul's investigation and whether St. Paul Mercury actually received notice of a potential claim under the 99-00 policies.

### 1.    Known Loss

"If the insured knows or has reason to know, when it purchases a CGL policy, that there is a substantial probability that it will suffer or has already suffered a loss, the risk ceases to be contingent and becomes a probable or known loss."  *Outboard Marine Corp.* v. *Liberty Mut. Ins. Co.*, 607 N.E.2d 1204, 1210, 154 Ill. 2d 90, 180 Ill. Dec. 691 (1992).  "There is no bright-line

test to determine whether and at what point in time the insured knew or had reason to know of the substantial probability of the loss at issue." *Id.* Rather, it is a case-by-case inquiry. *Id.* Where there is a known loss, "the insurer has no duty to defend or indemnify the insured with respect to the known loss *ab initio*, unless the parties intended the known loss to be covered." *Id.*

St. Paul Mercury and St. Paul Fire argue that they had no duty to defend because the underlying complaint in *Narducci* makes clear that the Village had been wiretapping its Finance Department's phone lines for at least five years prior to the inception of the 99-00 and 00-01 policies. *See* Ex. A to Am. Compl. ¶¶ 32–33; Ex. B to Am. Compl. ¶¶ 16, 26. They contend that this demonstrates that the wiretapping was a known loss not covered by the policy and that as a result, no duty to defend existed in the first place. Zurich and the insureds respond that the existence of a known loss is not clear from the face of the *Narducci* complaint and, even if it were, St. Paul Mercury and St. Paul Fire are estopped from asserting this defense as they failed to timely seek a declaration of their obligations.

An insurer is typically restricted to the allegations of the underlying complaint in determining whether the duty to defend exists. *See Md. Cas. Co.* v. *Peppers*, 355 N.E.2d 24, 28, 64 Ill. 2d 187 (1976). Once a declaratory judgment action has been filed, however, the court may look beyond the underlying complaint to determine whether the duty to defend was implicated as long as the evidence does not go to an ultimate fact in the underlying case. *Pekin Ins. Co.* v. *Wilson*, 930 N.E.2d 1011, 1019–20, 237 Ill. 2d 446, 341 Ill. Dec. 497 (2010). While one district court has concluded that "the applicability of the known loss doctrine need not be clear from the allegations of the complaint before an insurer may refuse a tendered defense,"

*Int'l Envtl. Corp.* v. *Nat'l Union Fire Ins. Co.* (*Int'l Envtl. Corp. II*), 860 F. Supp. 511, 517 (N.D. Ill. 1994),[8] the court is not convinced that the Illinois Supreme Court would follow this pronouncement.[9]  As the parties base their arguments on the allegations of the complaint only, the court will similarly consider only the underlying complaint and the insurance policies at issue to determine whether it was "*clear* from the face of the underlying complaint" that the known loss doctrine absolves St. Paul Mercury and/or St. Paul Fire from the duty to defend the insureds in *Narducci*.

The underlying complaint provides several details regarding notice to the insureds of a substantial probability of a loss prior to the filing of the complaint.  Specifically, it references Narducci's March 1, 2000 letter to Moore asking the Village Police Department to stop taping the Finance Department phone lines, Ex. A to Am. Compl. at ¶ 27, Narducci's subsequent discussions with Lemm and Moore that included Narducci revealing that he had discussed the taping with the Will County State's Attorney, *id.* ¶ 28–31, and Lemm's and Moore's acknowledgments that the wiretapping had been going on for approximately eight years prior to the filing of the complaint, *id.* ¶ 32–33.  St. Paul Mercury and St. Paul Fire contend that the allegation that the taping had been occurring for years prior to the inception of either policy and that Lemm and Moore knew of the taping prior to the inception of the 99-00 and 00-01 policies

---

[8] The court noted, however, that the insurer still ran the risk of being estopped from denying liability if a court found a duty to defend did exist and the insurer had not sought a declaratory judgment or defended the insured under a reservation of rights.  *Int'l Envtl. Corp. II*, 860 F. Supp. at 517 n.8.

[9] The exception recognized by the Illinois Supreme Court in *Wilson* appears to be a narrow one, as the court there only took into account other pleadings in the underlying litigation, such as counterclaims, in determining the insurer's duty to defend.  *Wilson*, 930 N.E.2d at 1021.  Further, *International Environmental Corp. II* was decided on summary judgment, where "not only the contents of third-party complaints in the underlying action but other evidence may be considered in determining the insurer's duty to defend."  *Id.* at 1020.

means that the known loss doctrine applies. Mere knowledge of the taping, however, does not clearly establish that the insureds knew of a substantial probability of loss as of June 1, 1999, when the 99-00 policies incepted. The issue is not whether the insureds knew of the taping but rather whether they knew or had reason to know that a probable loss would occur due to the taping. *See Outboard Marine Corp.*, 607 N.E.2d at 1212 ("The question is not whether [the insured] knew it was discharging a pollutant into the environment, as the insurers and their amici argue. Rather, the relevant question is whether [the insured] knew or had reason to know that a probable loss or liability would occur due to the PCB contamination alleged in the underlying complaints."). Because that question is left open by the complaint with respect to the 99-00 policies, the potential for coverage existed and St. Paul Mercury's duty to defend was triggered.[10]  The *Narducci* complaint does demonstrate that the wiretapping became a known loss prior to July 1, 2000, the date the 00-01 policy incepted. Once Narducci began making noise about the wiretapping around March 1, 2000, the insureds knew or at least had reason to know that there was a substantial probability that loss or liability would result from the wiretapping. An exception to the known loss doctrine exists where the parties intended for the known loss to be covered. *See Outboard Marine Corp.*, 607 N.E.2d at 1210; *Mo. Pac. R.R. Co.* v. *Am. Home Assurance Co.*, 675 N.E.2d 1378, 1384–85, 286 Ill. App. 3d 305, 221 Ill. Dec. 648 (1997). Thus, if St. Paul Fire knew of the substantial probability of loss prior to the inception of the 00-01 policy and intended for it to be covered, the known loss doctrine does not exempt St. Paul Fire from the duty to defend. The insureds provided St. Paul Mercury with the April 2000

─────────────────────────

[10] Consideration of any extrinsic evidence in the record would not change the court's analysis of the issue, as nothing in it demonstrates that the insureds were aware of a substantial probability of loss related to the wiretapping prior to March 2000.

correspondence between Sturino, Haberkorn, and Sullivan related to an anonymous report of eavesdropping by the Village on April 27, 2000.  St. Paul Mercury also received a copy of an article regarding the Seventh Circuit's decision in *Abbott* v. *Village of Winthrop Harbor*, 205 F.3d 976 (7th Cir. 2000), which involved the surreptitious recording of personal phone calls on a municipality's police department line by the police chief.  St. Paul Mercury conducted an investigation in which it determined that a claim had not yet been made but that Sturino and Haberkorn were urging the Village to undertake an internal investigation of the issue.  Despite this knowledge, St. Paul Fire, St. Paul Mercury's affiliate, agreed to provide the Village with commercial general liability coverage for the year beginning July 1, 2000.  Its decision not to provide the Village with any other coverage leaves open the question of whether St. Paul Fire intended to exclude any loss related to the wiretapping from coverage.  Because it is not evident from the pleadings whether the parties intended to cover the loss, the court cannot conclude at this stage whether St. Paul Fire has the duty to defend the insureds in *Narducci*.  Consequently, the court will proceed in its analysis only considering St. Paul Mercury's duty to defend.

### 2.    Misrepresentation

The 99-00 policies contain a clause on fraud and misrepresentation:

This entire policy, including all coverage parts, will be void and coverage will be forfeited if, whether before or after a loss, any insured:
•    intentionally conceals or misrepresents any material fact or circumstance;
•    engages in fraudulent conduct, or
•    makes false statements;
relating to this insurance or any fact or circumstance material to the investigation of any claim made.[11]

---

[11] St. Paul Mercury cites to the generally applicable section on Fraud and Misrepresentation in their policies, namely that "This policy is void if you or any other protected person hide any important information from us, mislead us, or attempt to defraud or lie to us about any matter concerning this

(continued...)

Ex. C-1 to Am. Compl. at 27.  Material misrepresentations in the negotiation of an insurance

policy must have been made in the written application for the policy to be avoided.  215 Ill.

Comp. Stat. 5/154.  St. Paul Mercury contends that there are questions of fact as to whether the

Village deliberately misrepresented the existence of the wiretapping and complaints and

inquiries about it such as those made by Narducci and Grapenthien in 2000.  If such

misrepresentation occurred, it asserts that the 99-00 policies are void.  The issue of whether the

99-00 policies were void because of misrepresentations by the insureds must be determined prior

to considering whether estoppel bars St. Paul Mercury from raising coverage defenses.  *State*

*Farm Ins. Co.* v. *Am. Serv. Ins. Co.*, 773 N.E.2d 666, 672, 332 Ill. App. 3d 31, 265 Ill. Dec. 902

(2002).  A material misrepresentation made in an application or during an investigation does not

render an insurance policy void *ab initio* but rather only voidable.  *See Ill. State. Bar Ass'n Mut.*

*Ins. Co.* v. *Coregis Ins. Co.*, 821 N.E.2d 706, 715, 355 Ill. App. 3d 156, 290 Ill. Dec. 394 (2004).

An insurer can waive the defense of rescission based on misrepresentation if it is not promptly

exercised.  *Id.* at 713–16.  If the insurer seeks to void a policy based on a material

misrepresentation in the insurance application under section 154, it cannot be rescinded after the

policy has been in effect for one year or a policy term.  215 Ill. Comp. Stat. 5/154.  Generally, a

material misrepresentation grants "an insurer the option to ratify the policy despite the

misrepresentation if it so chooses, but also impos[es] a duty upon an insurer that chooses instead

---

[11](...continued)
insurance – either before or after a loss.  Of course, everyone makes mistakes.  Unintentional errors or
omissions won't affect your rights under this policy."  Ex. C-1 to Am. Compl. at 22.  This section,
however, was replaced by the section quoted in the text so that the policies comply with Illinois law.  *See*
*id.*

to void the policy to do so promptly, or risk waiving that right." *Ill. State Bar Ass'n*, 821 N.E.2d at 717.

In this case, regardless of whether the insureds made a material misrepresentation in the insurance application or concealed information from St. Paul Mercury or St. Paul Fire during the claim investigation, St. Paul Mercury has waived the right to void the 99-00 policies by not acting promptly to do so. Any potential claim of misrepresentation based on the insurance application is barred by the one year limitation contained in section 154. Further, St. Paul Mercury and St. Paul Fire have known about the Village's alleged failures to provide them with additional information about the wiretapping for at least several years yet did not seek to rescind the policies within a reasonable time. St. Paul Mercury's conduct in assuming the defense in *Narducci* in April 2010, albeit reserving its right to deny coverage on the basis that the Village provided St. Paul Mercury with fraudulent or misleading information at the time it obtained its insurance,[12] is inconsistent with an intent to rescind the contract based on alleged misrepresentations and concealment in 2000 and 2001. As the court finds that St. Paul Mercury waived its right to rely on misrepresentations or concealment to void the 99-00 policies, the insureds' potential violation of the fraud and misrepresentation provision of the policies is immaterial to St. Paul Mercury's duty to defend.

### 3. Notice Under the 99-00 Policies

St. Paul Mercury claims that there are questions of fact as to whether the April 2000 Acord Notice it received constitutes notice of a potential claim that would make the *Narducci*

---

[12] As noted, this cannot be a valid basis for voiding coverage as section 154 provides a one year limit to the insurer's ability to rescind coverage for misrepresentations made in the policy or application for the policy.

suit a claim first made during the 99-00 policies' term, thus triggering the duty to defend under

that policy.  The April 2000 Acord Notice enclosed Sturino and Haberkorn's letter, which

informed the Village that they had received reports of eavesdropping and encouraged the Village

to investigate, and correspondence between Sullivan and Sturino and Haberkorn, in which

Sullivan asked for additional information not only to evaluate possible legal violations but also

"to address the liability insurance carrier of the Village as to the possibility of any claims that

may be made against the Village."  Am. Compl. ¶ 22 & Ex. I.  Finally, the April 2000 Acord

Notice attached an article summarizing the Seventh Circuit's then-recent decision in *Abbott* v.

*Village of Winthrop Harbor*, which dealt with a similar situation.  St. Paul Mercury's claims

investigator noted that while no claim was being made at that time, the issue "was reported by

the Village Attorney to avoid a late notice issue should something arise out of [it]."  Ex. 7 to Am.

Cross-Claim.

       In their response, St. Paul Mercury and St. Paul Fire admit that the April 2000 Acord

Notice "very well may have been notice of a wrongful act."  Opp'n to Mot. for J. on the

Pleadings at 21.  Nonetheless, they contend that the notice given did not sufficiently describe the

wrongful act that could give rise to a claim and instead only recounted unsubstantiated rumors of

eavesdropping.  While the April 2000 Acord Notice indeed did not provide St. Paul Mercury

with the level of detail required by the 99-00 policies, St. Paul Mercury cannot now rely on these

provisions to argue that the notice was deficient and the duty to defend was not triggered, as St.

Paul Mercury did not inform the insureds at the time that the notice was defective.  *See State

Farm Mut. Auto. Ins. Co.* v. *Gray*, 570 N.E.2d 472, 475, 211 Ill. App. 3d 617, 155 Ill. Dec. 959

(1991) ("A waiver consists of a voluntary, intentional relinquishment by the insurer of a known

right and may be express or implied, arising from the acts, words, conduct, or knowledge of the insurer."); *F.D.I.C.* v. *Interdonato*, 988 F. Supp. 1, 10–11 (D.D.C. 1997) (insurer may waive compliance with policy's notice provisions by acting in a way inconsistent with the intention to enforce the right); *St. Paul Fire & Marine Ins. Co.* v. *Metro. Urology Clinic, P.A.*, 537 N.W.2d 297, 300 (Minn. Ct. App. 1995) (insurer has obligation to inform insured of defects in notice). "If notice provided to an insurer is considered by the insurer to be defective, good faith requires the insurer to notify the insured of its objections within a reasonable time, and if the insurer fails to do so or proceeds to act as though notice was satisfactory, it has waived any right to assert notice as a defense at a later date." *Fed. Sav. & Loan Ins. Corp.* v. *Burdette*, 718 F. Supp. 649, 653–54 (E.D. Tenn. 1989). Here, St. Paul Mercury opened a claims file, investigated the circumstances surrounding the notice, indicated that notice was provided "to avoid a late notice issue," and closed the file because no claim had been made at that time. St. Paul Mercury did not in any way indicate to the insureds that the notice did not comply with the notice provisions of the 99-00 policies. Thus, St. Paul Mercury cannot now argue in good faith that the April 2000 Acord Notice was insufficient so that subsequent claims related to wiretapping do not relate back to the 99-00 policies. Because St. Paul Mercury has waived any argument related to the sufficiency of the notice it received, the insureds' potential failure to comply with the notice provisions does not prevent St. Paul Mercury's duty to defend from being triggered.[13] Because St. Paul Mercury's arguments that it did not have a duty to defend fail, the court will proceed to

---

[13] Even if waiver did not apply, it is likely, as discussed below, that St. Paul Mercury would be estopped from arguing that it did not have a duty to defend based on the insureds' failure to provide it with sufficient notice of the potential for a claim during the policy term. *See Uhlich*, 929 N.E.2d at 540–42 (finding that estoppel applies to late notice defenses under claims-made policies, as "[t]here is nothing in *Ehlco* limiting the estoppel doctrine to occurrence-based policies").

consider whether St. Paul Mercury should be estopped from asserting policy defenses to coverage.

### B.     Estoppel

Estoppel applies if an insurer breaches the duty to defend by not defending the insured under a reservation of rights or seeking a declaratory judgment in a timely manner.  *Ehlco*, 708 N.E.2d at 1135.  The court has concluded that seeking a declaratory judgment prior to the imminent conclusion of the underlying suit is not sufficient to avoid estoppel, with the proper test being instead whether a declaratory judgment action was sought within a reasonable time of the insurer learning of the underlying suit.  St. Paul Mercury learned of the underlying suit at the latest by September 2001 when it received Acord Notices with additional information about the suit.  This declaratory judgment action was filed by Zurich over five and a half years later in April 2007.  St. Paul Fire sought a declaratory judgment in state court in July 2007 that involved not only the 00-01 policy but also the 99-00 policies.  The five and a half year delay cannot be considered a reasonable time.  *See Elec. Ins. Co.*, 346 F. Supp. 2d at 969 (nineteen month delay unreasonable); *Coltec Indus. Inc.*, 2004 WL 413304, at *10 (seven years)*; Uhlich*, 929 N.E.2d at 543 (two years); *J.R. Construction Co.*, 777 N.E.2d at 620 (21.5 months); *Korte*, 750 N.E.2d at 769–70 (twelve months).  Thus, St. Paul Mercury may not rely on any defenses subject to estoppel to avoid coverage.

### C.     Reimbursement of Defense Costs and Prejudgment Interest

Zurich seeks reimbursement of 100% of its defense costs in the *Narducci* action and prejudgment interest on this amount pursuant to 815 Ill. Comp. Stat. 205/2.  The Zurich policies provide that Zurich has the duty to defend suits seeking damages to which its policies apply.  Its

Law Enforcement policy provides primary coverage, while its Public Officials and Employment Liability policy provides excess coverage. Except for the umbrella policy, St. Paul Mercury's and St. Paul Fire's policies at issue here function as primary coverage. Zurich recognized its duty to defend by defending the insureds in *Narducci* under a reservation of rights. The court has not yet determined whether Zurich did not have the duty to defend. Such a determination would extinguish Zurich's obligation to pay for costs on a going forward basis but not entitle Zurich to recoupment of the costs it expended while defending under a reservation of rights. *See Gen. Agents Ins. Co. of Am., Inc.* v. *Midwest Sporting Goods Co.*, 828 N.E.2d 1092, 1103, 215 Ill. 2d 146, 293 Ill. Dec. 594 (2005) (absent a provision in the insurance contract providing that the insured must reimburse the insurer for the defense costs incurred by the insurer upon a determination that the insurer had no duty to defend, such reimbursement is not allowed). Zurich contends that St. Paul Mercury and St. Paul Fire are obligated to cover 100% of the defense costs in *Narducci*, not just their pro rata shares, because they are estopped from arguing that Zurich shares responsibility for primary coverage in the underlying suit. The court is not convinced that estoppel extends to this issue. Courts have found excess insurers to be entitled to full reimbursement of costs where the primary insurer has failed to provide a defense or timely file a declaratory judgment action. *See, e.g.*, *Cent. Mut. Ins. Co.* v. *Kammerling*, 571 N.E.2d 806, 212 Ill. App. 3d 744, 156 Ill. Dec. 826 (1991); *Cas. Ins. Co.* v. *Northbrook Property & Cas. Ins. Co.*, 501 N.E.2d 812, 150 Ill. App. 3d 472, 103 Ill. Dec. 495 (1986); *Aetna Cas. & Sur. Co.* v. *Coronet Ins. Co.*, 358 N.E.2d 914, 44 Ill. App. 3d 744, 3 Ill. Dec. 371 (1976); *see also W. Cas. & Sur. Co.* v. *W. World Ins. Co.*, 769 F.2d 381, 385 (7th Cir. 1985) ("An insurer is required to defend whenever the loss is even arguably within the policy. But when one policy is primary

and the other is excess, only the primary insurer need defend claims below the limits of the primary policy." (citation omitted)). In this case, however, Zurich under its Law Enforcement policy, St. Paul Mercury under the 99-00 policies, and St. Paul Fire under the 00-01 policy are all primary insurers. Zurich thus remains obligated to cover its share of defense costs. St. Paul Mercury has already agreed to pay half of all past and future fees incurred by Zurich in defending the insureds in *Narducci*. While Zurich is only obligated to cover its share of the defense costs, the final share cannot be determined at this stage as whether St. Paul Fire will have to share in the defense remains to be determined.

Pursuant to Illinois law, Zurich may recover interest of 5% per annum on the amount it is owed for already incurred defense costs if the court concludes that St. Paul Mercury acted vexatiously and unreasonably in delaying the undertaking of the defense. 815 Ill. Comp. Stat. 205/2; *Santa's Best Craft, LLC* v. *St. Paul Fire & Marine Ins. Co.*, 611 F.3d 339 (7th Cir. 2010). Because the court has determined that St. Paul Mercury unreasonably delayed in seeking a declaratory judgment and defending under a reservation of rights, the court concludes that awarding prejudgment interest is appropriate on the amount St. Paul Mercury is obligated to reimburse Zurich to date.

## CONCLUSION AND ORDER

For the foregoing reasons, Zurich's motion [#174] is granted in part and denied in part, the insureds' motion [#170] is granted in part and denied in part, and St. Paul Mercury and St. Paul Fire's motion [#180] and cross-motion [#197] are denied. The clerk is directed to enter judgment for Zurich on Counts III and IX of the amended complaint and for the Village of Bellwood, Lemm, and Moore on Count I of their amended cross-claim and on St. Paul

Mercury's intervening complaint. This case will be called for a status hearing on February 24, 2011 at 8:30 a.m.


Dated: January 26, 2011                    Enter: _____
                                                  JOAN HUMPHREY LEFKOW
                                                  United States District Judge